**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**AT COVINGTON**

**CIVIL ACTION NO. 04-149-DLB**

**ANDREA FITZGERALD**                                                                          **PLAINTIFF**

**vs.**                              **MEMORANDUM OPINION & ORDER**

**BOONE COUNTY PUBLIC SAFETY**
**COMMUNICATIONS CENTER, ET AL.**                                       **DEFENDANTS**

* * * * * * * * * * * * *

## INTRODUCTION

This Americans with Disabilities Act ("ADA") case was brought by Plaintiff, an individual denied employment as a dispatcher.  By all accounts Plaintiff is an educated, experienced, and motivated individual with a strong law enforcement background.  She is also deaf in her right ear.

Defendant hired Plaintiff to work as a dispatcher, then subsequently ended her employment approximately five weeks post-hire.  Defendant does not deny that Plaintiff was let go from her position because she is deaf in her right ear.

Defendants move for summary judgment.  Having reviewed the pleadings, and having heard from counsel at oral argument, the Court finds that Plaintiff's termination did not violate the ADA.  Plaintiff has failed to prove an essential element of her case, namely that she was perceived as disabled by Defendant.  Therefore, summary judgment in Defendant's favor is warranted.

## FACTUAL BACKGROUND

Plaintiff Andrea Jones Fitzgerald is deaf in her right ear and has been deaf since the age of three. She has extensive law enforcement training and credentials. In early 2003, Defendant Boone County Public Safety Communications Center ("Public Safety Center" or the "Center") had an opening for a Communications Operator/Telecommunicator, a/k/a dispatcher. Fitzgerald applied for the position.

Upon review of Fitzgerald's written application, Defendant[1] concluded she was a strong candidate for the position and had her take a written test, on which she did very well. Next, she was interviewed by Ron Porter, Director of the Public Safety Center, and Jan Mullikin, Dispatch Supervisor. Defendants acknowledge that during the interview Fitzgerald "mentioned" that she had "hearing loss," but that she insisted it would not interfere with her ability to do the job. Subsequently, she was sent to a physician chosen by Defendants for a pre-employment physical. The physical included a hearing test. The physician cleared Fitzgerald to work, without restrictions. As Defendant puts it, "[t]he Center's management, unfortunately, did not follow up with [the physician] at the time on the hearing test or on whether Ms. Fitzgerald was truly fit for the unique aspects of this particular position." (Doc. #15, p. 5) Plaintiff testified the doctor commented to her that he guessed she would be dispatching with her left ear.

Fitzgerald has a slightly different recollection of the interview process. She says that during the interview she volunteered the fact that she is deaf in one ear. Upon being

---

[1]The Complaint also named as Defendants each of the members of the Boone County Public Safety Communications Center Board. For ease of reference, use of the singular Defendant nevertheless refers to the Defendants collectively.

informed of this, she was asked and confirmed that it is only one ear, at which point Porter spoke with Mullikin to confirm that a hearing test is done as part of the physical.  According to Plaintiff, Porter then told her that if she passed the hearing test, she would be hired. Fitzgerald says she reported for and underwent the physical scheduled by Defendant and passed it, along with a background check and polygraph, at which point she was formally hired.

Plaintiff started at the Public Safety Center on March 16, 2003, working as a third-shift dispatcher.  Her shift supervisor and trainer was Peggy Knipfer, whom Fitzgerald had not met during her pre-employment hiring process.  Fitzgerald testified she informed Knipfer about the loss of hearing in her right ear.  At what point she did this is not clear in the record.

Plaintiff's first job task was simply to observe activities in the Center.  She was then off from work for ten days on a pre-approved leave for her wedding.  Upon her return, she worked a short period of time taking calls until she was let go on April 17, 2003.  When she was hired, the original plan was for Knipfer to train her on the duties of being a dispatcher for the Public Safety Center, which training was to occur over a six-month period.

A brief discussion of Defendant's call center is helpful to consideration of Plaintiff's claims.  Defendant describes the Public Safety Center as providing sophisticated dispatch services.  The Center coordinates various regional emergency services.  At the time of Plaintiff's employment, there could be up to seven dispatchers in the room at one time, working as a team.  Defendant emphasizes that dispatchers in a sophisticated call center like its Public Safety Center must be able to multi-task by being able to hear and listen to potentially multiple communications at a time.  Dispatchers wear a headset over which they

3

receive 911 calls.  The headset requires only one ear be covered.  There is also a radio in the room upon which police and fire calls are received.  Therefore, it is possible that while a dispatcher is handling a 911 call, a police or radio call may be simultaneously occurring. Defendant calls attention to the fact that the job description for the dispatcher position requires that the person "be able to multi-task while listening to both traffic on their station and dialog within the room."

Defendant submits Plaintiff's employment was terminated upon recognition that Fitzgerald's hearing loss in her right ear is a complete loss and then noticing problems with Fitzgerald's performance while she was in the call-taking stage of her training.  Specifically, Knipfer noticed that Fitzgerald would turn to face those in the dispatch room when they spoke to her.  Knipfer testified that she observed that when Fitzgerald was on the telephone with a caller, it appeared as if she were ignoring the supervisor.  Knipfer said she asked Plaintiff if she were reading lips, to which she responded affirmatively, although she said it was more out of habit than necessity.

A specific incident occurred shortly after Plaintiff started her shift on April 16, 2003 that led to Defendant's decision to terminate her employment as a dispatcher with the Center.  According to Kniper, while Fitzgerald was handling a 911 call, an announcement came in on the radio over the fire channel.  The announcement came in twice, but Plaintiff did not respond.  Knipfer said she instructed Fitzgerald that she needed to answer the radio call, but that she did not do so.  Knipfer testified that, at that point, she believed Fitzgerald had not heard either the announcements or her instruction, as she was preoccupied listening to a caller using her left, and only functional, ear and was therefore unable to hear the other audible activities occurring in the room.

4

Based on her belief that Plaintiff could not effectively work as a dispatcher at the Center, Knipfer spoke with Jan Mullikin about the situation. They subsequently brought Knipfer's observations and concerns to Porter's attention. Porter then spoke with technical support, after which he concluded that the headsets utilized by the dispatchers were an essential part of the job that could not be addressed by other equipment, such as a handset. Porter testified he therefore agreed with Mullikin and Knipfer that Plaintiff's employment as a dispatcher should end because she could not safely and effectively perform the essential functions of the job. Porter, Mullikin, and Knipfer met with Fitzgerald and expressed their concerns. They state Plaintiff did not at that time protest that she had, in fact, heard the fire announcement. According to Defendants, during this meeting Fitzgerald said that she understood their concerns and did not want to be responsible for endangering anyone's safety. Porter testified he told her that he would recommend her as a dispatcher for a smaller center. Her employment officially ended at that point.

Fitzgerald's recollection differs. She testified that she is fully capable of performing the essential job duties of a dispatcher, but Knipfer regarded her as hearing impaired and unable to hear activity in the Public Safety Center. Plaintiff claims she wore her headset such that it only partially covered her good ear, thereby allowing her to hear both callers and the radio and other dialog occurring within the dispatch room. Defendant disputes this partial covering of one ear as being an effective, acceptable method to handle emergency calls, given that the audibility of some 911 calls requires concentrated listening skills. Plaintiff testified that Knipfer often wore her headset in the manner Plaintiff described, although Knipfer noted she does so in conjunction with her supervisory role over the entire room. Fitzgerald also points out that her dispatch station had a playback function feature,

5

as did every other station, and that it was used often by the dispatchers to play back call messages.

As for the lip-reading incident with Knipfer, Fitzgerald testified that this occurred shortly after she returned from vacation, that the two of them were reading magazines and talking during a lull in activity, during which time Fitzgerald had her headset pushed back. She testified that while she heard Knipfer perfectly fine, she looked over at her while she was speaking because it is appropriate social etiquette. She acknowledged that she is able to read lips and may do so on occasion out of habit, but that reading lips is not a necessity in order for her to communicate.

As for the fire call incident, Fitzgerald testified that Knipfer incorrectly assumed that she did not hear the fire call because she was engaged in a 911 call. She says she did, in fact, hear it and recalls the report over the radio by the subject fire department, but did not react to it because she had not yet been trained to respond to the radio calls.

On April 23, 2003, about a week after being let go and after consulting with an attorney, Fitzgerald contacted Porter asking for a reasonable accommodation pursuant to the ADA and that she be permitted to return to work. Porter responded by letter, rejecting her request on grounds that she could not wear the required headset and perform the necessary multi-tasking, that it would be an undue hardship for the Center to employ her as a dispatcher, and that they had no other jobs available for her.

Plaintiff has since become employed as a safety officer with Northern Kentucky University, where she previously worked as an officer. She alleges that the experience with Defendant has now closed off her intended career path in dispatching, due to being viewed as disabled. She testified she now has to say that she was fired by Defendant, is typically

6

asked why, and must subsequently explain the circumstances.  She applied for a dispatcher position with the police division at the Greater Cincinnati-Northern Kentucky International Airport and was told her same difficulty in being able to hear and process dispatch room communications while wearing their required headset over her functional ear would also be a problem at its dispatch facility.

Plaintiff's Amended Complaint alleges discrimination in violation of the ADA, 42 U.S.C. § 12101, *et seq.* and Kentucky law, K.R.S. § 344.040, based upon both actual and perceived disability.[2]  After a period of discovery, Defendants filed the pending motion seeking summary dismissal of all claims against them.

### DISCUSSION

Plaintiff asserts disability discrimination in violation of both federal and state law. Because the essential elements of an ADA claim and a claim under Kentucky's civil rights statute are the same, the state claim is addressed implicitly with the federal analysis. *Brohm v. JH Properties, Inc.,* 149 F.3d 517, 520 (6th Cir. 1998); *Howard Baer, Inc. v. Schave,* 127 S.W.3d 589, 592 (Ky. 2003).

#### *Standard of Review*

Summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to a judgment

---

[2]Count III of Plaintiff's Complaint alleges discrimination in her apprenticeship and training. She asserts the same disability discrimination as alleged in Count I (ADA) and Count II (Ky. Rev. Stat. Chapter 344), but specifically for her training period.  Since the substance of Count III is the same (discrimination), the parties' filings were directed to all three Counts, rather than separately addressing each Count.

as a matter of law."  Fed. R. Civ. P. 56(c).  The court must view the evidence and draw all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587-88 (1986); *Jackson v. Leighton,* 168 F.3d 903, 909 (6th Cir. 1999).  The nonmoving party, however, may not rest on allegations alone, but instead must come forward with some significant probative evidence to support its claim.  *Celotex Corp. v. Catrett,* 477 U.S. 317, 324 (1986).  The central issue is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251-52 (1986).

### *Prima Facie Proof of Disability Discrimination*

Under the ADA,

[n]o covered entity shall discriminate against *a qualified individual with a disability because of the disability of such individual* in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.

42 U.S.C. § 12112(a)(emphasis added).  Defendant does not dispute that it is an entity covered by the ADA.  Thus, Defendant is prohibited from discriminating against a qualified person with a disability because of that disability.  In this case, the alleged discriminatory act is Plaintiff's discharge from Defendant's employment.

Presentation of a prima facie case of disability discrimination can be accomplished through either direct or indirect evidence.  *Monette v. Electronic Data Sys. Corp.,* 90 F.3d 1173, 1178 (6th Cir. 1996).  Here, it is undisputed that the Public Safety Center's decision to terminate Plaintiff's employment as a dispatcher was based upon the likewise undisputed

8

fact that Plaintiff is deaf in her right ear.  Thus, Fitzgerald proceeds under a direct evidence theory.

In her Amended Complaint, Plaintiff asserts Defendant discriminated against her for both actual and perceived disability; therefore, Defendant addressed both theories in its Motion for Summary Judgment.  However, in her Response, Fitzgerald concedes she no longer seeks to assert a claim of actual disability and instead presents her case solely as a "regarded as disabled" claim.

"Regarded as" disabled is, of course, also actionable under the ADA.  42 U.S.C. § 12102(2)(C).  Subsection (C) provides that having a disability includes "being regarded as having" a disability.  *See Todd v. City of Cincinnati,* 436 F.3d 635, 636 (6th Cir. 2006).  Congress' intention in including "regarded as" disabled in the Act was to allow persons to be judged according to their actual capacities, rather than "myths, fears, and stereotypes" about a perceived impairment.  *Sutton v. United Air Lines, Inc.,* 527 U.S. 471, 489-90 (1999).

In direct evidence "regarded as" cases, the plaintiff must establish that: "(1) he or she [was regarded as] ... 'disabled.'  (2)  The plaintiff bears the burden of establishing that he or she is 'otherwise qualified' for the position despite his or her disability: (a) without accommodation from the employer; (b) with an alleged essential job requirement eliminated; or (c) with a proposed reasonable accommodation.  (3) The employer will bear the burden of proving that a challenged job criterion is essential, and, therefore a business necessity, or that a proposed accommodation will impose an undue hardship upon the employer."  *Todd,* 436 F.3d at 638 (quoting *Monette,* 90 F.3d at 1186).

9

This raises the threshold question – was Plaintiff Fitzgerald regarded as disabled by the Public Safety Center?  Or, more specifically in the summary judgment context, is there sufficient evidence to create a genuine issue of material fact as to whether the Center perceived Fitzgerald as disabled due to her hearing impairment?

The ADA defines "disability" as "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such impairment; or, (C) being regarded as having such an impairment."  42 U.S.C. § 12102(2); *Toyota Motor Mfg., Kentucky, Inc. v. Williams,* 534 U.S. 184, 193 (2002).  The regulations, in turn, define "physical and mental impairments" as any physiological disorder or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems: neurological, musculoskeletal, special sense organs, respiratory (including speech organs), skin and endocrine.  28 C.F.R. § 35.104.  More specifically, physical and mental impairment includes such conditions as orthopedic, visual, *speech and hearing impairments,* and cerebral palsy.  *Id.* (emphasis added).

In this case, it is undisputed that Plaintiff has a physical impairment in the form of complete loss of hearing in her right ear.  However, proof of a disability for purposes of the ADA is not satisfied by the presence of an impairment alone.  Proof of ADA "disability" also requires evidence that the impairment substantially limits a major life activity.  *Toyota Motor Mfg., Kentucky, Inc.,* 534 U.S. at 193.  Here, since Plaintiff presents her claim as being regarded as disabled, she must point to proof that the Center perceived her impairment substantially limits a major life activity.

The EEOC regulations define "regarded as having such impairment" to mean: (1) has a physical or mental impairment that does not substantially limit major life activities but

10

is treated by a covered entity as constituting such limitation; (2) has a physical or mental impairment that substantially limits major life activities only as a result of the attitudes of others toward such impairment; or, (3) has none of the impairments defined in paragraphs (h)(1) or (2) of this section but is treated by a covered entity as having a substantially limiting impairment.  29 C.F.R. § 1630.2(l).  In elaborating upon this concept, the Supreme Court explains that to meet the "regarded as having such an impairment" definition of disabled, a plaintiff must show "1) a covered entity mistakenly believes that a person has a physical impairment that substantially limits one or more major life activities, or 2) a covered entity mistakenly believes that an actual, nonlimiting impairment substantially limits one or more major life activities."  *Sutton,* 527 U.S. at 489; *see also Moorer v. Baptist Mem'l Health Care Sys.,* 398 F.3d 469, 479 (6th Cir. 2005).

Fitzgerald position is that her right-ear deafness does not actually substantially limit her major life activities, but contends that management at the Public Safety Center treated her as though she was substantially limited.  The terms "substantially limits" and "major life activity" are "interpreted strictly to create a demanding standard for qualifying as disabled." *Toyota Motor Mfg., Kentucky, Inc.,* 534 U.S. at 197.   Under the regulations, major life activities mean "functions such as caring for oneself, performing manual tasks, walking, seeing, *hearing,* speaking, breathing, learning, and working."   29 C.F.R. § 1630.2(l) (emphasis added).  The term "substantially limits" means "[u]nable to perform a major life activity that the average person in the general population can perform; or [s]ignificantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform the same major life activity."  29

11

C.F.R. § 1630.2(j)(1).  Fitzgerald argues that the Center erroneously perceived her actual, but nonlimiting, hearing impairment as substantially limiting her in the major life activities of hearing and working.  Each of these areas is considered in turn.

### *Regarded as Disabled in the Major Life Activity of Hearing*

Preliminarily, Plaintiff emphasizes that, in "regarded as" cases, what an employer "regards" as disabled goes to the Defendant's state of mind or intent and so is more appropriately a question of fact for the jury rather than an issue that can be determined at the summary judgment stage.  There is authority supportive of such a proposition.  *Ross v. Campbell Soup Co.,* 237 F.3d 701, 706 (6th Cir. 2001)(the focus of the "regarded as" theory is on the employer's state of mind).  Even so, there must still be a genuine issue of material fact related to the employer's alleged perception of disability.  Plaintiff must come forth with probative evidence from which the jury could reasonably find for her on this point.

At oral argument, Plaintiff was asked to identify the specific evidence she relies upon as establishing a jury question on whether Defendant misperceived her ability to hear in the major life activity of hearing.  She points to two items: (1) when her training supervisor Knipfer asked her if she were reading lips, and (2) when, shortly before being let go, Knipfer went to Porter following the 911 call and reported that Plaintiff is completely deaf and unable to hear.

As to Plaintiff's exchange with Knipfer about lip-reading, Plaintiff has not shown or explained how this evidences Defendant regarded her as substantially limited in her ability to hear in everyday life.  Plaintiff insists she does not need to read lips in order to communicate.  But regardless of whether she needs to do so, it is undisputed that she can do so and told Knipfer as much.  While perhaps in the context of everyday life she may

12

unconsciously read lips, the surrounding environment of Knipfer's query was a workroom with coworkers seated in a circle, facing outward, with a headset covering one ear, in Plaintiff's case covering the only ear from which she can hear.  A question, from a training supervisor, and in such an environment where her left ear may not be open and available to listen, directed to whether she reads lips is driven by and focused upon determining if there are circumstances where she must face and see someone speaking in order to "hear" them.  In that particular work environment, the ability to do this may not be readily available.  This is not evidence Knipfer perceived her as substantially limited in her ability to hear in contexts outside of this.  It sheds no light on how her employer might perceive her hearing abilities in everyday life, outside of work.   To read anything else into this exchange is nothing more than conjecture by Plaintiff, rather than reasonable inference.

As for Plaintiff's reliance upon the exchange between Knipfer and Porter, the context is important.  Plaintiff portrays it as Knipfer describing her to Porter as being completely deaf – unable to hear in both ears.  Aside from taking excerpts of Porter's testimony as to his recollection of what Knipfer told him out of context, the evidence simply does not reasonably support such a conclusion or create a fact question for a jury.  A review of Knipfer's discovery deposition reveals she never expressed that she believed Plaintiff to be completely deaf.  As for Porter's recollection of Knipfer's report to him, he testified that she told him words to the effect that "this girl's deaf, she can't hear out of one ear, deaf in one ear . . . basically she wanted to bring it to my attention that the young lady could not hear, she was totally deaf out of one ear." (Doc. #21, p.26)

In this context – that is, shortly after Plaintiff's handling of a 911 call and Knipfer's observation and belief that Fitzgerald did not hear a simultaneous fire call going out over

13

the radio in the dispatch room nor hear Knipfer directing her to respond to it – Knipfer was referring to the fact that Plaintiff could not process noises from within the room *because* she was listening to a call over the headset covering her left ear.  The reference to her inability to hear and deafness are in reference to her right ear.  Plaintiff's interpretation of that testimony is not a reasonable one.  Had Knipfer been suggesting that Plaintiff was unable to hear from either ear and completely deaf, as a practical matter she would have been unable to process *any* of the calls she initially listened to in training and, at the time, was then being trained to respond to.

Thus, it is clear that the context being referred to is that of Plaintiff's capacity to listen to other communications within the room at times in which her left ear is covered by the headset.  This deals with Plaintiff's ability to function on this particular job site.  The evidence is not probative of Defendant's beliefs on whether Plaintiff was unable or significantly restricted in her ability to hear in daily life.  The Supreme Court in *Williams* explains that a major life activity, in this case hearing, is not substantially limited simply because an employee's impairment prevents him from performing a particular job.  *Toyota Motor Mfg., Kentucky, Inc.,* 534 U.S. at 200-02; *see also EEOC v. Daimler Chrysler Corp.,* 111 Fed. Appx. 394, 399 (6th Cir. 2004)(unpublished)("[T]he inquiry must focus on the effect of the impairment on the individual's daily life, not on its effect on the individual ability to perform a specific job.").

Defendant also submitted affidavits confirming their observations of Plaintiff's general hearing abilities.  Plaintiff had the opportunity to explore the topic during deposition and to offer affidavits from her own witnesses refuting these statements.  She has not.  There is no indication that Plaintiff's supervisors were aware of any other problems

14

associated with her hearing impairment other than what they observed and were concerned about in the context of their workplace.  Plaintiff has not offered any relevant, probative evidence to the contrary.

While at summary judgment a court should not weigh evidence or make credibility determinations or factual findings, *see Anderson,* 477 U.S. at 249, and *Weaver v. Shadoan,* 340 F.3d 398, 405 (6th Cir. 2003), it does determine if there is sufficient evidence to create a fact question for the jury.  Fitzgerald has not come forward with evidence sufficient for a jury to conclude that she was "unable to perform" the life activity of hearing or "significantly restricted as to the condition, manner or duration" under which she could hear in everyday life such that the Center mistakenly believed she was "substantially limited" in her ability to hear in the major life activity of hearing.  29 C.F.R. § 1630.2(j)(1).  The Court therefore concludes a fair-minded jury could not return a verdict in Plaintiff's favor on this point.

### ***Regarded as Disabled in the Major Life Activity of Working***

Alternatively, Plaintiff claims the Center perceived her as disabled in the major life activity of working.  The EEOC regulations state that

> [w]ith respect to the major life activity of *working,* the term *substantially limits* means significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities.  The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working.

29 C.F.R. § 1630.2(j)(3)(I).  Thus, "[w]hen the major life activity under consideration is that of working, the statutory phrase 'substantially limits' requires, at a minimum, that plaintiffs allege they are unable to work in a broad class of jobs" or "'a broad range of jobs in various

classes.'" *Sutton,* 527 U.S. at 491-92 (1999)(quoting same).[3] "One must be precluded from more than one type of job, a specialized job, or a particular job of choice.  If jobs utilizing an individual's skills ... are available, one is not precluded from a substantial class of jobs. Similarly, if a host of different types of jobs are available, one is not precluded from a broad range of jobs."  *Sutton,* 527 U.S. at 492.  That is, "[t]he inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working." *McKay v. Toyota Motor Mfg. U.S.A., Inc.,* 110 F.3d 369, 373 (6th Cir. 1997).

Proving that an employer regarded a plaintiff as disabled from the major life activity of working is no small hurdle.  Indeed, it

> takes a plaintiff to the farthest reaches of the ADA.  It is a question embedded almost entirely in the employer's subjective state of mind.  Thus, proving the case becomes extraordinarily difficult.  Not only must a plaintiff demonstrate that an employer thought he was disabled, he must also show that the employer thought that his disability would prevent him from performing a broad class of jobs.  As it is safe to assume employers do not regularly consider the panoply of other jobs their employees could perform, and certainly do not often create direct evidence of such considerations, the plaintiff's task becomes even more difficult.

*Ross,* 237 F.3d at 709.

Here, Plaintiff's evidence is focused on the Defendant mistakenly believing her hearing disabled her from performing the dispatch job at the Center, rather than a mistaken belief that her hearing impairment precluded her from a substantial class of jobs or broad range of jobs.  Viewing the facts in the light most favorable to Fitzgerald, it is reasonable

---

[3]Whether "working" qualifies as a major life activity has not been definitively answered by the Supreme Court.  The Sixth Circuit has viewed working as a major life activity that can be raised by a plaintiff, while noting the EEOC's suggestion of evaluating it "as a residual category resorted to only when a complainant cannot show she or he is substantially impaired in any other, more concrete major life activity."  *Mahon v. Crowell,* 295 F.3d 585, 590 (6th Cir. 2002).

to interpret Defendant's comments as indicating a mistaken belief that she could not adequately perform the tasks associated with acting as a dispatcher at the Center.  The evidence suggesting that Defendants believed her unable to work anywhere as a dispatcher is lacking.  Defendant's actions demonstrate that it did in fact regard Fitzgerald as being able to perform some dispatch jobs, including dispatch work for a prior employer. Viewed in the light most favorable to Fitzgerald, the remarks of Defendant's representatives demonstrate only that they viewed her as unable to dispatch for their particular type of call center.  *Compare Murphy v. United Parcel Service, Inc.,* 527 U.S. 516, 525 (1999)("[T]he undisputed record evidence demonstrates that petitioner is, at most, regarded as unable to perform only a particular job.") *with Ross,* 237 F.3d at 709 (evidence of employer's concoction of a pretextual excuse for plaintiff's firing and that plaintiff suffered repeated back injuries supported inference that employer more likely to view him as "significantly limited in his ability to lift or in his ability to work in a broad class of jobs, not simply his job at Campbell Soup.").

Fitzgerald was required to show that Defendant regarded her as unable to work in a broad class of jobs or a broad range of jobs in various classes, *Baptist Mem'l,* 398 F.3d at 481, meaning that it perceived her as unable to perform the same general type of work in the same geographic area.  *Henderson v. Ardco, Inc.,* 247 F.3d 645, 652-54 (6th Cir. 2001)(plaintiff must show employer perceived her as "substantially impaired" in performing other employment suitable to her age, education and experience, available in geographic area).  Plaintiff also has extensive education, background, and training in law enforcement generally.  There is likewise no evidence Defendant believed her substantially limited from

performing a range of jobs in this field.  And she has, in fact, previously worked in law enforcement positions.

Fitzgerald has not come forward with such evidence.  In fact, the record indicates Defendant was willing to recommend Plaintiff for dispatcher positions at smaller facilities that did not utilize headsets.  And Plaintiff obtained subsequent dispatch employment at a smaller facility with a previous employer.  Plaintiff's only "evidence" are her self-serving affidavit conclusions that a broad class or entire class of jobs in telecommunications and dispatching, and law enforcement generally, is foreclosed to her.  She has not put forth expert or other competent evidence as to the geographical area from which she might procure employment and what job positions are available in that area for one with training, knowledge and skills similar to her.  Plaintiff does point out that she applied to the Greater Cincinnati-Northern Kentucky International Airport and was denied a dispatcher position, allegedly for the same reasons Defendant concluded she could not work at the Public Safety Center.  This hearsay evidence shows only that she was denied employment in a dispatch position of comparable working environment circumstances to that of Defendant, and not that Defendant perceived her as being disabled from the entire class of dispatcher jobs or the broad range of law enforcement positions for which she is qualified.

## CONCLUSION

Plaintiff has failed to create a genuine issue of material fact on whether Defendant regarded her as having an impairment that substantially limits her major life activities of hearing and working.  *Todd,* 436 F.3d at 636.  This is the first prong in the essential elements of Plaintiff's ADA claim.  Since Plaintiff has failed to make a sufficient showing on

an essential element of her case, and she bears the burden of proof, Defendant is entitled to summary judgment.  *See Celotex Corp.,* 477 U.S. at 323.

Accordingly, **IT IS ORDERED** that:

(1)    Defendants' Motion for Summary Judgment (Doc. # 14) is hereby **granted;** and,

(2)    This matter is hereby **dismissed, with prejudice,** and **stricken** from the docket of the Court.

A separate Judgment will be entered contemporaneously herewith.

This 22nd day of September, 2006.

Signed By:

*David L. Bunning*

**United States District Judge**

G:\DATA\Opinions\2-04-149-MSJ.wpd